RICARDO JOVE and MARIA ROSA JOVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jove v. Commissioner
Docket No. 8378-72.
United States Tax Court
T.C. Memo 1975-155; 1975 Tax Ct. Memo LEXIS 214; 34 T.C.M. (CCH) 710; T.C.M. (RIA) 750155; May 22, 1975, Filed Herbert Stoller, for the petitioners. Walter C. Welsh, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency of $469.76 in petitioners' 1969 Federal income taxes. In addition, petitioners have claimed a refund of $9,023.44 of such taxes. Because of concessions by petitioners, the only issue before us is whether petitioners are entitled to deductions in 1969 under section 166(a) [1] or section 162(a) for any part of an advance *215 made by Ricardo Jove to a corporation in 1955. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Ricardo and Maria Rosa Jove resided in Great Neck, New York, at the time the petition herein was filed. They filed a joint Federal income tax return for their 1969 calendar year with the North-Atlantic Service Center in Andover, Massachusetts. Ricardo Jove (petitioner), a native of Spain, began working in Spain for an American corporation, Commodity Service Corporation (CSC), in March of 1951. Petitioner, who was 25-years old at the time, acted as CSC's agent in the purchase of Spanish products for export to the United States, and in the sale of American goods in Spain. CSC paid petitioner a salary of $100 a month and expenses in the early 1950's, and, in addition, petitioner received commissions from other companies, primarily Spanish and British corporations with whom he came into contact because of his work for CSC. The amount of such commissions varied significantly from year to year--from negligible amounts to almost $25,000 in one year. *216 In 1955, petitioner made two visits to the United States for discussions with the officers of CSC, including S. B. Slotpole, and for a look at the company's domestic operations. On June 1, 1955, petitioner, while in the United States, made an advance of $70,000 to CSC from his bank account with the Bank of London and South America, Ltd., in New York. Any claim petitioner had to repayment of such amount, however, was subordinated in a written instrument to claims of the Bank of America of New York (Bank of America) against CSC. No notes or instruments of any kind were executed for the amount advanced CSC by petitioner. There was no plan of repayment agreed upon at the time the advance was made, or at any time thereafter, and no interest was ever charged. During his second trip to the United States on October 19, 1955, petitioner agreed to purchase 43 shares of CSC preferred stock at $750 per share, and 17 shares of CSC class A common stock at $10 per share, both classes from Edgar R. Molina (Molina), an officer of the corporation. Petitioner obtained the $32,420 required to make this purchase from CSC, thus reducing the amount of his outstanding advance to CSC, made in June, to *217 $37,580. The purchase was made as part of a financial reorganization of the company, and Molina utilized at least some part of the funds he received from petitioner to pay back debts he owed CSC. CSC preferred stock carried with it no dividend or voting rights, but, in the event of a corporate liquidation, each share of the preferred stock entitled the holder thereof to a $1,000 preference before any distribution to owners of the common. After the October 19 sale, the preferred stock of CSC was held as follows: Owner
Shares
Petitioner
43
John S. Andrews
26
Edgar R. Molina
40
Frank Molina
17
S. B. Slotpole
40
166 total outstanding By October 28, 1957, Slotpole had bought out all the preferred shareholders except petitioner, and thus owned 123 of the outstanding 166 shares. The common stock of CSC was the basic voting stock of the company, each share entitling the owner thereof to one vote at stockholders' meetings. After the October 19 sale, the CSC common was held as follows: Owner
Shares
Petitioner
17
John S. Andrews
10
Edgar R. Molina
83
Frank Molina
7
S. B. Slotpole
83
200 total outstanding By October 28, 1957, however, *218 Slotpole owned 183 shares of common, and petitioner the remaining 17. On October 26, 1955, petitioner signed a new subordination agreement--to replace the June 1 document--in which any claim he had to the $37,580--which was the amount outstanding from the original June advance--was again subordinated to claims of the Bank of America. On its May 31, 1956, October 31, 1956, and October 31, 1957 balance sheets, CSC listed the advance by petitioner as "Other Liabilities, Advances - R. Jove." On its balance sheets commencing on May 31, 1958, $37,300 was described as a subordinated long-term loan from R. Jove. The balance of $280 from the original June 1955 advance is not accounted for by the record. Between 1955 and 1964, petitioner established numerous contacts through CSC with companies in Central and South America. In addition, he was able to do Central and South American work for a Spanish corporation from which he had been receiving commissions since the early 1950's. By 1960, when petitioner began to reside in the United States, he was receiving approximately $1,000 a month as salary from CSC, in addition to commissions from the above-mentioned companies. The amounts of such commissions *219 are not established in the record, but they were, on the average, somewhat higher than those he had been receiving in the early 1950's. During the same period of 1955-1964, CSC, at first, showed a steady increase in sales and consistent profits. From an overall deficit of approximately $40,000 in 1956, the company showed a surplus of $342,208.02 on its May 31, 1963 balance sheet. For some unexplained reason, however, CSC suffered a severe financial reversal in its 1964 fiscal year. In that year alone, the company showed a loss of over $850,000. Its next fiscal year ending May 31, 1965, was no better, and a further loss of almost $1.4 million was recorded. In an attempt to re-establish itself as a profitable enterprise, CSC, on October 15, 1964, entered into an agreement with Amtraco Sales Corp. (Amtraco), a company which, like CSC, was engaged in the import-export business. Relevant provisions of the agreement are as follows: 1. COMMODITY hereby transfers, sets over, and assigns to AMTRACO, absolutely, (1) all of its right, title, and interest in and to the name COMMODITY SERVICE CORPORATION and in and to all common law and statutory trademarks and trade names throughout the world *220 belonging to COMMODITY, and (2) all customers' and suppliers' lists, books of account, records, correspondence, contracts, and the like belonging to COMMODITY. 2. Within ten (10) days of the date hereof COMMODITY shall duly change its corporate name to one that does not include either the words "Commodity" or "Service" or any derivation thereof. COMMODITY shall furnish AMTRACO with a certified copy of such certificate as filed. 3. Simultaneously with the execution of this agreement AMTRACO is forming a Division of its corporation, to be known as COMMODITY SERVICE DIVISION. COMMODITY hereby expressly consents to the use of said name by said Division of AMTRACO. 4. Insofar as AMTRACO engages in the business of importing and exporting meat, meat products, and edible oils, it shall do so through said Division. In importing and exporting dairy products it shall deal with the customers appearing on the customers' list referred to in paragraph 1 hereof through said Division. 5. COMMODITY covenants and agrees that, during the term of this agreement, it will not engage directly or indirectly, except through AMTRACO, in the business of importing, exporting, selling, distributing, or *221 in any way dealing in meats, meat products, edible oils, dairy products, or related products anywhere in the world. * * * 8. In consideration of the grant to AMTRACO hereunder, AMTRACO agrees to pay to COMMODITY fifty (50%) percent of the annual "net profits" of said Commodity Service Division as finally and conclusively determined by the certified public accountants employed by AMTRACO, less $25,000. per annum * * * 14. The term of this agreement shall be for two months commencing as of November 1, 1964, to December 31, 1964, and shall continue thereafter from calendar year to calendar year, provided, however, that either party may elect at any time to terminate this agreement by giving at least six (6) calendar months prior written notice of such election. 15. Upon the termination of this agreement AMTRACO shall retransfer, set over, and reassign to COMMODITY those items transferred, set over, and assigned to AMTRACO pursuant to paragraph 1 hereof. After termination AMTRACO shall not solicit any of the customers whose names appear on the list delivered pursuant to paragraph 1 hereof for a period of five (5) years from the date of termination. Pursuant to said *222 agreement, CSC changed its name to Comserco Corporation. CSC also agreed, at this time, to remit all proceeds from the Amtraco contract to the Bank of America and the Chase Manhattan Bank, who would together act as agents for CSC's creditors. On the same day on which the CSC-Amtraco agreement was signed, petitioner entered into an employment contract with Amtraco. Under the terms of such agreement, Amtraco would pay petitioner $25,000 a year to direct and manage Amtraco's new Commodity Service Division, subject to the control, at all times, of Amtraco's president and board of directors. During the period in which such agreement was in effect, petitioner received no commissions from other sources. Pursuant to Amtraco's election, its agreement with CSC was terminated as of January 31, 1969. During the period in which the agreement was in effect, CSC was able, because of Amtraco's efforts, to pay approximately $1,000,000, or over 50 percent of CSC's outstanding debt, to the Bank of America and the Chase Manhattan Bank who were agents for CSC's creditors. Upon termination of the contract, however, it was the opinion of petitioner, who was at that time CSC's president, that CSC could *223 no longer be operated as a profitable enterprise. CSC became inactive after January 31, 1969, and was finally liquidated in 1970. No part of petitioner's advance to CSC, outstanding on October 26, 1955, was ever repaid. At the time of the termination of the CSC-Amtraco agreement, petitioner renegotiated his employment contract with Amtraco to receive a percentage of the business profits in addition to his salary. On his 1969 return, petitioner claimed a short-term capital loss deduction for the $37,580 of his advance to CSC which was outstanding on October 26, 1955. He later filed a claim for refund alleging that $37,300 of this amount [2] was deductible as an ordinary loss pursuant to section 166(a). In his statutory notice of deficiency, respondent disallowed certain claimed business expenses of petitioner, and determined that his taxable income had to be increased by another $1,000 because of a mathematical error on the return. Respondent has also rejected petitioner's claim for a refund. Petitioner has conceded respondent's disallowance of certain business expenses and his determination of an increase in taxable income due to the mathematical error. *224 OPINION In 1951, petitioner, a Spanish national and then 25-years old, began working in Spain as an agent for CSC, a company involved in the export-import business. In June of 1955, petitioner came to the United States to explore CSC's domestic operations, and at that time advanced $70,000 from his personal funds to such company. The following October he exchanged $32,400 of such advance for a stock interest in CSC, and is now claiming ordinary loss treatment for $37,300 of the balance of the advance, CSC having ceased business operations in 1969 without ever having paid back this amount. We turn first to the question of whether petitioner is entitled to deduct $37,300 of the advance he made to CSC in 1955 as a business bad debt. To qualify for bad debt treatment, one must prove both that a debt existed at some time during the taxable year in question, and that such debt became worthless by the end of such taxable year. , affd. . In the instant case, we find that petitioner's advance to CSC in 1955 did not create a debt for tax purposes, and hence that petitioner may not rely *225 on section 166(a) in claiming a deduction for such advance. In order for an advance to constitute a debt for tax purposes, it must be established that at the time the advance was made there existed the intention in both parties to create a debtor-creditor relationship, the debtor being subject to an enforceable obligation of repayment. , affd. ; . In the instant case, it is not possible for us to find the existence of such intentions. Petitioner received no notes or other evidences of indebtedness at the time of the advance or at any time thereafter. He charged no interest to CSC on the advance, and no plan of repayment was ever agreed upon. It is true that CSC did eventually carry the advance on its balance sheets as a subordinated long-term loan, but such factor alone, in our view, cannot be relied upon to find the requisite intent, especially in light of the much more substantial evidence supporting respondent's position that a debt had not been created. Petitioner argues that it was his understanding that *226 he would be repaid the advance when and if CSC generated sufficient profits. Accepting the existence of such an understanding, however, it further weakens petitioner's position. For such understanding makes it clear that petitioner's right to repayment was a totally contingent one--contingent both on CSC generating sufficient profit, and on CSC's own discretionary decision as to when its profits would be sufficient to allow a repayment. While it is true that one need not have an "unqualified expectation of repayment," , and that there is always risk involved in an unsecured advance, , where the decision to repay rests in the discretion of the person who received the advance, a debt has not been created for tax purposes. . In short, it is our finding that petitioner contributed $70,000 to CSC's capital in June of 1955, and in October of the same year was allowed in effect to utilize a part of this capital contribution to acquire a stock interest in the corporation, *227 an arrangement which we are quite satisfied was within the contemplation of the parties in June. Thus, since petitioner's advances to CSC at no time constituted a debt for tax purposes, he is not entitled to a bad debt loss deduction in 1969. Finally, petitioner contends that, should we find that the June 1955 advance to CSC was not in the nature of a debt, that the $37,300 can be deducted as a business expense under section 162. Such position, however, is of no avail to petitioner in the instant case. For even accepting petitioner's argument to the extent that he might have been entitled, at some time, to an expense deduction in the requested amount, such expense would only be deductible in the year "paid or incurred," section 162(a), which was 1955, a year not before us in the instant case. Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
2. Petitioner remembers no repayment of $280, but has conceded such amount at trial and as a consequence is now contending for an ordinary loss of only $37,300.↩